812 A.2d 981

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,

v.

Sol SHEINBEIN.

Misc. AG No. 37, Sept. Term 2001.

Court of Appeals of Maryland.

Dec. 16, 2002.

226

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Attorney Grievance Com'n of Maryland, for petitioner.

Melvin Bergman, Beltsville, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

CATHELL, Judge.

Bar Counsel, on behalf of the Attorney Grievance Commission, petitioner, and at the direction of the Review Board, filed a petition with this Court seeking disciplinary action against Sol Sheinbein, respondent,[1] pursuant to Maryland Rule 16–709(a).[2] The petition alleges that respondent violated provisions of Rule 8.4 of the Maryland Rules of Professional Conduct (MRPC) based on complaints from Bar Counsel and Henry R. Quintero.[3] The relevant provisions of Rule 8.4 provide that:

"It is professional misconduct for a lawyer to:

. . .

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; . . .

(d) engage in conduct that is prejudicial to the administration of justice."

---

1. Mr. Sheinbein was admitted to the Maryland Bar on June 24, 1971 and is engaged in the practice of patent law from Israel, his current place of residence.

2. Rule 16–709(a) states that "[c]harges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board." We note that this reference is to Md. Rule 16–709(a) as stated in the 2001 edition of the Maryland Rules. What was formerly comprised in Rule 16–709 is now encompassed in several different rules in the 2002 edition.

3. *See* BC Docket Nos.2000–113–16–6; 2000–222–00–6.

Pursuant to Maryland Rule 16–709(b) and 16–711(a),[1] this Court referred the matter to Judge S. Michael Pincus of the Circuit Court for Montgomery County to conduct an evidentiary hearing and to make findings of fact and conclusions of law with respect to respondent's case. Respondent was duly served and he filed a timely answer to the petition. On March 20, 2002, that evidentiary hearing took place. Judge Pincus heard testimony from two witnesses, Paul T. Stein, attorney for Samuel Sheinbein and later for respondent, and Detective Paula Hamill, the primary detective investigating the murder of Alfredo Tello, Jr.[5] The remaining evidence admitted at the hearing included the application for a search warrant and the warrant that had been served upon respondent prior to any of respondent's actions giving rise to the instant proceeding. Additionally, respondent's admissions were also among the evidence considered. Specifically, the hearing judge admitted the following:

"[T]he Statement of Charges in *State of Maryland v. Sol Sheinbein*, District Court of Maryland for Montgomery County, Case No. 6D00071133; an Arrest Warrant on Charging Document, Warrant No. D980442735 in *State of Maryland v. Sol Sheinbein*, District Court of Maryland for Montgomery County, Case No. 6D00071133; Application for Statement of Charges in *State of Maryland v. Sol Shein-*

---

**4.** Rule 16–709(b) states that the "Court of Appeals by order may direct that the charges be transmitted to and heard in any court and shall designate the judge or judges to hear the charges and the clerk responsible for maintaining the record in the proceeding."

Rule 16–711(a) states that a "written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

We note that these references to Md. Rules 16–709(b) and 16–711(a) are as stated in the 2001 edition of the Maryland Rules. What was formerly comprised in Rule 16–709 is now encompassed in several different Rules in the 2002 edition. What was Rule 16–711(a) is now encompassed in Rule 16–759.

**5.** Respondent's alleged misconduct concerns his actions in sending his son, Samuel Sheinbein, to Israel after respondent had been told by his son that the son had killed Mr. Tello and after respondent knew that Samuel was being investigated by Detective Hamill in relation to the murder of Mr. Tello.

*bein,* Case No. 6D00071133; an Application for Search and Seizure Warrant in Montgomery County, Maryland dated September 19, 1997, and the resultant Search and Seizure Warrant issued on September 19, 1997, for the residence located at 2940 Birch Tree Lane, Silver Spring, Montgomery County, Maryland, then the residence of the Respondent and his family, which included his son Samuel. Finally the Court received, as part of Petitioner's evidence, the transcript of the Secret Grand Jury Proceeding conducted on September 25, 1997, which contained the eighty-two page transcript of the testimony of the Respondent, Sol Sheinbein on that date."

After the hearing, Judge Pincus found, by clear and convincing evidence, that respondent violated MRPC 8.4. Respondent filed in this Court several exceptions to Judge Pincus' findings of fact and conclusions of law. We overrule these exceptions and accept the hearing judge's findings of fact and conclusions of law. Considering respondent's egregious conduct, the appropriate sanction is disbarment.

## I. Facts

### A. The Hearing Judge's Findings of Fact

From the evidentiary record below, we include part of Judge Pincus' findings of fact relevant to our inquiry and we hold that they were established by clear and convincing evidence:

"1. On or about September 16 or 17, 1997, Alfred Enrique Tello, Jr. was the victim of a murder that took place in Montgomery County, Maryland.

2. On September 19, 1997, at approximately 11:00 a.m., the body was discovered in the garage on the premises located at 14041 Breeze Hill Lane in Montgomery County, Maryland.

. . .

4. Upon discovery [of the body] the homicide division of Montgomery County Police Department was notified.

. . .

11. During a canvas of the neighborhood pursuant to the discovery of the body, investigators located a witness who observed a dark green car (possibly a Camaro) and an older white car (possibly a Toyota) parked in front of the Breeze Hill Lane location.

12. Two individuals were observed and described as one being a white male with an unkempt appearance, and another who was described as a dark-complected white or possible Hispanic male, 5′11″ in height with an athletic build weighing between 180 and 200 pounds and having dark hair. This witness identified these individuals as having been in the front yard of the residence on either September 16 or 17, 1997.

. . .

15. These male subjects were described as being, white male, age 19 to 21, 5′10″ with dark hair, athletic build, wearing a dark tee shirt and dark pants and the other subject as a white male, 20 years of age, with medium brown hair, husky build, wearing tan pants and a white tee shirt.

16. The investigators, based upon the witnesses observations, searched the pathway from Birch Tree Lane, and with the use of cadaver dogs, traced what appeared to be droplets of blood from the Breeze Hill Lane address to a location on Birch Tree Lane that ended at the street across from 2940 Birch Tree Lane, the residence of Samuel Sheinbein.

17. The Sheinbein residence on Birch Tree Lane is directly behind the residence at 14041 Breeze Hill Lane where the victim's body was found.

18. Investigators identified that Robert Israel Sheinbein, the brother of Samuel Sheinbein, and elder son of the Respondent herein, owned a Pontiac Firebird and listed the 2940 Birch Tree Lane address on his registration.

. . .

22. Homicide investigators ascertained Samuel Sheinbein was seventeen years of age, 5′10″ in height with a muscular

build and presented an appearance to be Hispanic or a light skinned black.

23. They also determined, from the son of the owner of the Breeze Hill Lane property, that Sheinbein lived on Birch Tree Lane, behind the Breeze Hill Lane property, and drove a dark green Pontiac Firebird with tinted windows, not unlike the body style of the Camaro one witness identified as being in the street in front of the Breeze Hill Lane premises.

24. All of the above information was incorporated into an affidavit in support of an application for a search warrant presented to a District Court judge in Montgomery County on September 19, 1997.

25. The search warrant was requested to perform a search of the premises located at 2940 Birch Tree Lane, Silver Spring, Montgomery County, Maryland in connection with the investigation of the murder of Mr. Tello.

26. The warrant was sought to search the Sheinbein residence for evidence of a crime of first degree murder ... and any other evidence relating to the crime of first degree murder.

. . .

28. On September 19, 1997, the search warrant and supporting affidavit, incorporating the above referred facts with greater specificity and additional disclosures, was presented to the Respondent herein.

29. The Respondent at the time of the execution of the search warrant read the contents and observed the search of his residence, particularly the garage.

30. The search of Respondent's premises took approximately five hours and as a result investigators seized receipts, a box for a circular saw, rubber gloves, a shirt with apparent blood stains, and a police scanner.

31. At the time of the execution of the search warrant, when the documents were presented to the Respondent, and after the items were observed and seized pursuant to the warrant, a homicide detective indicated to the Respondent

the seriousness of the matter under investigation and requested the Respondent contact her if he heard from his son, which he indicated he would do.

32. At the time of the presentment of the search warrant and its execution, the Respondent was asked if he owned a 'red Ron Rico' garden cart. Respondent indicated he did but, when his garage was searched the cart was not found.

33. That cart in fact was the one recovered at the homicide scene.

34. The following day, September 20, 1997, at 1:30 p.m., the homicide detective who had served the search warrant upon the Respondent spoke with him by telephone. She inquired whether or not Respondent had heard from his son Samuel and was informed he had not.

35. At that time she was advised Respondent had retained counsel.

36. That was the last time she spoke with Respondent.

37. A warrant was issued for the arrest of Samuel Sheinbein on the evening of September 20, 1997. Before the arrest warrant could be executed and served upon Samuel Sheinbein, Samuel fled Maryland and left the United States to travel to Israel, upon the suggestion of the Respondent and with his aid and assistance. (Grand Jury Transcript, p. 65, lines 3–13, p. 65, lines 15–25, p. 67, lines 1–17)

38. The Respondent paid for the plane ticket to Israel, albeit a round trip ticket, and brought the passport of his son, Samuel Sheinbein, to him in New York to enable him to leave the United States.

39. The Respondent, pursuant to a grant of immunity, testified before the Grand Jury for the State of Maryland in Montgomery County on September 25, 1997.

40. Prior to that grant of immunity, Respondent and his family had invoked their Fifth Amendment privilege against self-incrimination and, after being brought before a judge of the Circuit Court of Montgomery County, where they again collectively asserted their Fifth Amendment privilege, a ruling was made to compel their testimony.

. . .

42. The Respondent admitted to the Grand Jury, during his sworn testimony, that he was aware of his son's acquaintance with a friend by the name of Aaron Needle, a codefendant in the murder of Alfred Enrique Tello, Jr. The Respondent's testimony, in connection with his son Samuel's relationship to Aaron Needle, indicated he did not wish his son to associate with Needle due to their both having run afoul of the juvenile authorities.

43. Respondent's protestations to the contrary notwithstanding he learned, shortly prior to the death of Mr. Tello, that Needle and his son Samuel were associating again, and were in fact associating quite closely and frequently.

44. The Respondent, in his testimony to the Grand Jury, under oath, indicated he was unaware of his son's association with the victim, Alfred Enrique Tello, Jr., also known as Freddie Tello.

45. The Respondent further testified that, in response to a specific question, he was uncertain whether or not a Makita circular saw or box for such a saw was in his garage.

46. The Respondent admitted he did not have much dealing within the garage, that it was in fact the domain almost exclusively of his son Samuel.

47. Under questioning at the Grand Jury, the Respondent under oath did testify that a blue tarp was known to have been purchased for the use of his son in protecting a jet ski which they had purchased for him.

48. The Respondent further testified under oath before the Grand Jury that on Wednesday, September 17, 1997, at approximately 9:00 p.m. he returned to his home where his son Samuel was found. At that time he had been contacted on his cell phone by his son Samuel and requested to bring home a pizza for their dinner. He did so but, upon his return Samuel said to him 'boy that was quick' and upon entering the house Respondent noticed a very strong odor.

49. He observed a fan standing in the kitchen to dissipate the smell and inquired of Samuel, relating to the fan, 'what

the hell is that?' Samuel replied he had accidentally discharged the battery for his jet ski and that, while recharging it, he connected it improperly and, as a result, while he was in his bedroom, the battery caught fire and that was the cause of the smell.

50. Respondent testified his son, upon questioning why he had not attempted to charge the battery in the garage, indicated a cord couldn't reach and therefore he did it in the kitchen.

51. Respondent did not seek to investigate and, although the smell permeated the entire house, including the upstairs bedroom area, went about his business without further inquiry.

52. The Respondent's testimony went on to reveal that later on the night of Wednesday, September 17, 1997, at approximately 1:15 a.m., the morning of Thursday, September 18, 1997, he observed a car parking across the street from his house. He noted this was unusual as all the homes had sufficient driveway and garage space and did not require on the street parking for his neighbors.

53. He observed an individual exit the car and walk up the street towards the right of his house.

54. Respondent saw the driver walking on his property, to the side of his garage, and then returning to the trunk of his car, opening the trunk, taking out a bag, which appeared like a shopping bag, and again approached his property to the side of the garage.

55. At that time he called the police and, anticipating their arrival, opened the front door. When the Respondent opened the door he was confronted by the individual who he then recognized to be Aaron Needle.

56. At that time the police arrived and Needle explained, in response to what he was doing there, that he was doing 'nothing, Sir nothing' but that he came by to see Samuel and 'give him something'.

57. The Respondent elected not to proceed any further, identified the individual as someone he knew to the police and thereupon they left.

58. The Respondent then questioned Needle about what he was returning to Samuel. Needle indicated he was returning Samuel 'his garbage bags'.

59. The Respondent's testimony went on to relate he invited Needle into his home and observed, what appeared to be, a box of garbage bags, and a yellow snake light.

60. Upon further inquiry to Needle, Needle explained he had in fact come over to meet with Samuel and go out with him. He indicated he and Samuel were going to see 'Maria'. Needle identified her as a Puerto Rican girl who Samuel had met and wanted to visit while her parents were away.

61. After the disclosures of the investigator, the review of the supporting affidavit and the search warrant, the Respondent had sufficient knowledge to believe his son was a suspect and probable perpetrator of the murder of Mr. Tello.

62. In addition to the facts contained in the affidavit to support the application for the search warrant, and the observance of the items seized in his own garage, Respondent also observed ashes on his garage floor, which investigators concluded was the situs of the dismembering and attempted immolation of the body of Alfred Enrique Tello, Jr.

At the time the Application for Search Warrant and Search Warrant were presented to the Respondent by Detective Hamill on September 17, 1997 [6], Detective Hamill learned the Respondent was a lawyer and was advised by him that he had an earlier contact from Samuel by phone. On more than one occasion, on the evening of September 19, 1997, between 9:30 and approximately midnight, Detective

---

6. We note that the hearing judge erred when transcribing this date into these findings of fact. Consistent with the transcript of Detective Hamill's testimony, the date the warrant was presented to respondent was September 19, 1997.

Hamill was assured by the Respondent that he would contact her whenever he heard from his son and otherwise alert her of his whereabouts. His representation to the contrary, he failed to do so although he did speak to Detective Hamill by phone at approximately mid-day on Saturday, September 20, 1997. During that conversation, although his son Robert had a telephone conversation with Samuel, the substance of which was relayed to the Respondent, he [respondent] failed to alert her [Detective Hamill] of that contact. Instead, he informed her the family had retained Paul T. Stein, Esquire, on behalf of Samuel and that, in the future, should there be any contact with Samuel, it should be through counsel.

63. Respondent's eldest son, Robert, received a telephone call at or about 10:00 a.m., September 20, 1997. He relayed the substance of that conversation to his parents that Samuel would call back at approximately 3:00 p.m. At that time both Robert and the Respondent spoke to Samuel. They urged him to come home which he indicated he was not prepared to do as he was in Ocean City. Respondent neither informed counsel, Paul T. Stein, Esquire, nor Detective Hamill, of his contact with Samuel at this time, nor did he otherwise convey the fact that he believed his son to be in Ocean City, Maryland.

64. At some time between 1:00 p.m. and 3:00 p.m. on September 20, 1997, Samuel did again call Robert. Samuel was to call back at which time he would speak to his father. When he did so his father indicated Samuel should 'get away from Aaron'.

65. Respondent contends his son Samuel expressed suicidal ideation in connection with Aaron Needle also having expressed a desire to commit suicide. *It was at this time the Respondent told his son he should go to Israel.*

66. *In furtherance of the efforts to facilitate Samuel's flight from the United States, the Respondent purchased airplane tickets for Samuel to depart from New York just prior to midnight September 21st and arrive in Tel Aviv,*

*Israel at approximately 10:00 a.m. Eastern time on Monday, September 22nd.*

67. When the Respondent met with Samuel on September 21st he was told he should take the Firebird, which Samuel and Needle drove to New York, and which contained a sawed off shotgun, stun gun and various handwritten notes from Samuel and Needle.

The Court finds that at no time while the Respondent was in the company of his son, Samuel, is there any indication that Needle was also present or any longer in Samuel's company.

68. Respondent did in fact turn over this evidence of the crime to his counsel who in turn made it available to the investigating authorities.

*Although the Respondent was unaware of the issuance of the arrest warrant on September 21, 1997, he was aware, from his observations of the results of the search warrant, his scrutiny of the application for the Search Warrant, and his discussions with Detective Hamill, that his son was a focus of the investigation and was a person who the investigating authorities expressed a great desire to interview at least as a witness if not a suspect. Nonetheless, Respondent obtained Samuel's passport prior to leaving Maryland and brought it to New York where he met his son. **Also, prior to the Respondent's suggestions that his son leave the United States for Israel, he was aware his son had admitted to killing Tello.** (Transcript, p. 50, lines 16–25, p. 51–56, lines 1–14)."* [Alterations added.][Emphasis added.]

## B. The Hearing Judge's Conclusions of Law

The hearing judge subsequently concluded that respondent violated MRPC 8.4(b) and (d). First, the hearing judge found that respondent's actions satisfied the elements of the common law offense of obstructing or hindering a police officer, which include:

"(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused[, here the Respondent,] which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused [, Sol Sheinbein,] of facts comprising element (1); and

(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2)."

*Cover v. State,* 297 Md. 398, 413, 466 A.2d 1276, 1284 (1983) (alterations added). Judge Pincus specifically found that respondent was "well aware of the duty that the police officer, Detective Paula Hamill, was in the process of performing, i.e. the investigation of the death of Alfred Enrique Tello, Jr." and that respondent knew of the Detective's desire to question his son, who respondent knew to be responsible for the death of Mr. Tello. In addition, respondent knew that his subsequent arrangements to assist his son to flee to Israel, would frustrate that officer's performance of her duties. Judge Pincus did not find respondent's argument, that respondent's intent was merely to save his son from Mr. Needle's influence and his son's alleged threats of suicide, to be credible and we are not prepared to disturb that credibility determination. He found that the facts satisfied the requisite elements of common law obstruction, and ruled that respondent had violated MRPC 8.4(b).

The hearing judge determined that respondent also violated MRPC 8.4(d) by "engag[ing] in conduct that is prejudicial to the administration of justice." This conclusion was based on the court's assessment that respondent's actions were criminal in nature and impaired the public's confidence in the entire legal profession. Reciting several egregious facts, the hearing judge concluded that respondent's sending his son to Israel in spite of the knowledge that his son was an "integral party to a criminal investigation" was "in direct contravention to the oath he swore in open court when he was admitted to the Bar of the Court of Appeals of Maryland on June 24, 1971."

On May 22, 2002, respondent filed in this Court several exceptions to Judge Pincus' findings of fact and conclusions of law. Petitioner did not file any exceptions.

## II. Discussion

This Court reviews attorney disciplinary proceedings according to the standard articulated in *Attorney Grievance Commission v. Gavin,* 350 Md. 176, 189, 711 A.2d 193, 200 (1998):

"This Court has original and complete jurisdiction over attorney disciplinary proceedings. Md. Rule 16–709b; *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 371, 653 A.2d 909, 914 (1995); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992). Under our independent review of the record, we must determine whether the findings of the hearing judge are based on clear and convincing evidence. The 'hearing court's findings of fact are *prima facie* correct and will not be disturbed unless they are shown to be clearly erroneous.' *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997) (citing *Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 347, 624 A.2d 503, 505 (1993)). Accordingly, the ultimate decision as to whether a lawyer has violated professional rules rests with this Court. *Garland,* 345 Md. at 392, 692 A.2d at 469; *Attorney Grievance Comm'n v. Breschi,* 340 Md. 590, 599, 667 A.2d 659, 663 (1995)."

The case *sub judice* presents this Court with a factual scenario that has not been previously before this Court.

### A. Absence of Self–Defense in Findings of Fact

Respondent takes no exception, to the hearing judge's Findings of Fact 1 through 67. Respondent does however except to the last sentence of Finding of Fact 68. The sentence in question states, "Also, prior to the Respondent's suggestions that his son leave the United States for Israel, he was aware

his son [Samuel Sheinbein] had admitted to killing Tello." (Alteration added). The basis for respondent's exception is that the hearing judge omitted a portion of respondent's Grand Jury testimony, which, according to respondent, causes the remaining language to be misleading. The testimony in question relates to respondent's knowledge of the details of Samuel Sheinbein's involvement in the Tello killing, as admitted by respondent's son.

We overrule this exception, as the hearing judge's omission of this testimony is irrelevant and, thus, not clearly erroneous. A hearing court's findings of fact are *"prima facie* correct and will not [be] disturb[ed] unless they are shown to be clearly erroneous." *Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 347, 624 A.2d 503, 505 (1993). The disputed omission of any mention of the son's assertion of self defense has little bearing on the outcome of this proceeding and is therefore, as to this proceeding, irrelevant.[7] It is undisputed that respondent knew, prior to his actions in encouraging and aiding his son in absconding to Israel, that his son had committed a homicide. Respondent's inappropriate conduct stems from sending his son to Israel with the knowledge that Samuel had committed a homicide in Maryland, not from the precise circumstances of Mr. Tello's death or whether a jury might ultimately credit his son's assertion of self defense.[8] The disputed finding does no more than state

---

7. The only possible relevance of this self-defense testimony would be as to whether respondent had the requisite intent to hinder Detective Hamill's investigation. The hearing judge spoke to this and it will be discussed by this Court *infra.*

8. Although respondent stated that his son claimed self-defense, that issue is for a jury to decide. Samuel was eventually charged with a felony. In addition, in 1999, Samuel Sheinbein pled guilty in an Israeli court to killing Mr. Tello and was sentenced to twenty-four years in an Israeli prison. He is eligible for parole after sixteen years of imprisonment and he is eligible to apply for weekend furlough privileges after only four years. *See* Jesse Hallee, *The Sheinbein Legacy: Israel's Refusal to Grant Extradition as a Model of Complexity,* 15 Am. U. Int'l L.Rev., 667, 705–06, 706, n. 214 (2001).

this in more concise terms; it does not suggest any improper interpretation.

### B. Rule 8(b)

This Court has held that Bar Counsel's standard of proof for a theory that respondent's actions violate the MRPC by constituting a crime, albeit no criminal conviction results, is to show that the underlying conduct constitutes a crime by clear and convincing evidence; not by the criminal "beyond a reasonable doubt" standard. *See Attorney Grievance Comm'n v. Childress,* 364 Md. 48, 55, 770 A.2d 685, 689 (2001); *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 390, 692 A.2d 465, 468 (1997); and *Attorney Grievance Comm'n v. Proctor,* 309 Md. 412, 418, 524 A.2d 773, 776 (1987). Using the clear and convincing standard, we hold that Bar Counsel presented sufficient facts to illustrate that respondent committed the crimes of obstructing or hindering a police officer. As such, respondent's conduct violates MRPC 8.4(b).

### 1. Common Law Obstruction

Respondent excepts to the hearing judge's finding that he committed the common law offense of obstructing or hindering a police officer through his actions of Sunday, September 21, 1997. His actions include suggesting to his son, Samuel, that Samuel flee to Israel, transporting of his son's passport from Maryland to New York City to facilitate the fleeing, purchasing of his son's plane ticket to Israel and ensuring that his son boarded that plane, all the while knowing that his son had killed Mr. Tello. We overrule this exception.

■ The Maryland common law elements for the offense of obstructing or hindering a police officer are:

"(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused of facts comprising element (1); and

(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2)."

*Cover*, 297 Md. at 413, 466 A.2d at 1284. The primary focus of respondent's exception is to the hearing judge's finding in reference to the fourth element, respondent's intent to obstruct or hinder Detective Hamill.

■ There is no challenge to the establishment of either elements (1) or (3), that Detective Hamill was "a police officer engaged in the performance of a duty" and that respondent had "knowledge . . . of facts comprising element (1)," respectively. *Id.* Respondent, in fact, had direct personal knowledge that Detective Hamill was involved in the investigation of Mr. Tello's death. Respondent not only had specific conversations with Detective Hamill regarding her investigation of Mr. Tello's death, but he examined the search warrant and the application for the warrant.

Judge Pincus specifically found that the application for the search warrant was examined by respondent while the search was being executed. The application clearly describes the details of the finding of Mr. Tello's body, (an obvious homicide), the observations of witnesses of two persons transporting something in a cart with a blue tarp cover similar to a cart and tarp owned by respondent in the direction of the house where the victim's body was found, that the cart was found in proximity to the body along with the blue tarp, that a trail of blood droplets led back to the vicinity of respondent's house, that respondent's son met the witnesses' description of one of the persons pushing the cart and that the respondent's son, at a relevant time, had obtained the location of the key that could be used to enter the house where the body was found from the son of the owner of that house.

The application clearly stated that the warrant to search respondent's house was being requested for the purpose of seeking evidence "of the crime of murder." Respondent not only read these documents, but observed the search warrant's execution and even verbally agreed to alert the Detective of his son's whereabouts. Furthermore, respondent even knew,

from his son's own admissions, that his son was *in fact* the person who killed Mr. Tello. We reject any suggestion that there was a lack of clear and convincing evidence establishing respondent's knowledge that a homicide had occurred and that his son was a primary suspect in a murder. Thus, these two elements are satisfied.

■ Similarly, there is no doubt that respondent's actions in devising and facilitating his son's departure to Israel obstructed and hindered Detective Hamill in the performance of her lawful duties. These actions denied Detective Hamill any opportunity to pursue investigatory leads and to contact, question, and subsequently arrest Samuel Sheinbein. Respondent was fully aware that his actions and omissions would impede Detective Hamill's investigation. These facts more than suffice to satisfy the first three elements of the common law offense of obstructing or hindering an officer.

■ To satisfy the fourth element, there must be a showing, by clear and convincing evidence,[9] that respondent intended to obstruct or hinder Detective Hamill's performance of her lawful duties. Respondent suggests that the hearing judge's finding of intent ignored our precedents that have held that this element requires a finding that the accused have the specific intent to obstruct or hinder the officer. Respondent further alleges that his actual intent, in keeping information from Detective Hamill and assisting his son to flee to Israel, was "to prevent his son from committing suicide or being killed in some sort of confrontation with the police." Respondent claims that he conjured the plan that, "as a last resort," put his son in a place, Israel, "where his son would not be contemplating suicide or running around with a gun in his car." Respondent then cites to events occurring *after* his son had already fled to Israel and his lack of knowledge regarding the arrest warrant for his son as evidence to explain respondent's intent.

The hearing judge said:

---

9. *See Childress*, 364 Md. at 55, 770 A.2d at 689; *Garland*, 345 Md. at 390, 692 A.2d at 468; and *Proctor*, 309 Md. at 418, 524 A.2d at 776.

"[T]he Court determines and concludes that the Respondent had the commensurate requisite intent to obstruct or hinder Detective Hamill in the performance of her duty. It is long established that:

'Unless there is evidence presented to the contrary, the law presumes that a person intends the nature [sic] and probable consequences of his acts. Thus, the requisite criminal intent may be inferred from the defendants [sic] voluntary and knowing commission of an act which is forbidden by law or from the defendant's omission to do an act required by law.' " [10]

We first look at the hearing judge's findings in regard to the credibility of respondent and determine whether those findings are clearly erroneous. Only then can we determine *what respondent knew on Sunday, September 21, 1997,* when he committed the acts resulting in this disciplinary action. The hearing judge specifically found that, "While the Respondent's position is that his intent may have been to save his son from the influence of Aaron Needle and the alleged threat of Samuel's suicidal ideation, the Court does not find these assertions to be credible." The question that we must answer is whether this finding of the hearing judge meets the clearly erroneous test.

The record is replete with facts that support the hearing judge's finding that respondent was not credible in testifying before the Grand Jury that his intent was limited to saving his son from Mr. Needle, suicide, or a shootout with the police. The most relevant facts come from respondent's own testimony [11] in front of the Grand Jury for Montgomery County,

---

**10.** Judge Pincus quoted from the Maryland Criminal Jury Instructions and Commentary, Second Edition, § 3.01 General Intent, p. 185 (citing *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)).

**11.** Respondent was not present at the March 20, 2002 hearing in front of Judge Pincus; he is presently in Israel. There is currently an

which is testimony that, in and of itself, undermines the credibility of respondent's intent argument. Although respondent may have had no actual knowledge of his son's pending arrest warrant at the time he arranged the flight to Israel, he certainly knew that the police, in all likelihood, would eventually seek to arrest him. The following exchange occurred at the Grand Jury proceeding:

"Q[uestion of Prosecutor] Okay. Now Sunday night, obviously, the trip is set up for Samuel to go to Israel. When did Robert go to Israel?

A[nswer of Respondent] Okay. On Monday, we decided that there was no—on Sunday, there was no arrest warrant whatsoever for Samuel, none whatsoever; that he was not a wanted person, he was not a fugitive. He was *not on the run officially* by the police—

Q Right.

A—*but he would be; that's obvious.*"

Respondent's Grand Jury Testimony at 69 (emphasis added) (alterations added). Here respondent plainly admitted that he knew that his son would "obviously" be on the run from an arrest warrant, although not yet "on the run officially." Coupling this with respondent's testimony that he brought his son's passport to him in New York City, suggests that his overriding concern was to assist his son to circumvent the law by absconding.

---

outstanding warrant for respondent's arrest. *See* Arrest Warrant on Charging Document, Warrant No. D980442735 in *State of Maryland v. Sol Sheinbein,* District Court of Maryland for Montgomery County, Case No. 6D00071133. Therefore, respondent's testimony in this record is the transcript from respondent's grand jury testimony that was heard in front of the Montgomery County Grand Jury on September 25, 1997. Judge Pincus heard no live testimony from respondent. However, Judge Pincus was still in the best position to assess the credibility of the evidence, as he did observe the demeanor and live testimony of the remaining witnesses. *See Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 402, 593 A.2d 1087, 1091 (1991) (stating how, in the context of an attorney grievance proceeding, a hearing judge is in the best position to assess the credibility of witnesses).

In addition, respondent's own testimony debunks his theory that he bought a round trip ticket in contemplation of Samuel's return after Samuel was no longer in danger. Respondent's testimony suggests that the price of the ticket was his true concern. In his Grand Jury testimony, respondent testified, "I went to Tower Air in New York City, and I purchased the ticket, a one-way ticket—well, a round-trip ticket is cheaper than one-way—on Tower Air."

The transcript of respondent's testimony also shows that respondent knew that Samuel was no longer in the presence of Aaron Needle or Needle's influence when respondent and his family met Samuel in New York City. The fact that Samuel was by himself is contrary to respondent's theory that Needle presented an imminent danger to Samuel. In addition, the hearing judge specifically found that Samuel turned over the car and the shotgun when his brother, mother and respondent came to New York. At that time, when in the presence of his family, Samuel was not in apparent imminent danger of committing suicide. The totality of the facts illustrates that respondent's true intent was to facilitate his son's escape from the United States, and at least placing in doubt the ultimate apprehension of his son by a jurisdiction in which respondent knew his son faced imminent and serious criminal charges. As the hearing judge found, " 'the requisite criminal intent may be inferred from the defendant's voluntary and knowing commission of an act which is forbidden by law.' "

Here, respondent severally hindered, even prevented, Detective Hamill from investigating Samuel Sheinbein in connection with the death of Mr. Tello. Because respondent's explanations as to his intent were not found to be credible, we look again to see what else the record reveals as to what exactly respondent knew at the time he helped Samuel go to Israel in order to ascertain whether there is clear and convincing evidence as to whether respondent's specific intent was to take actions which he knew would hinder or obstruct Detective Hamill. The record supplies ample evidence in that regard.

First and foremost, at the time he helped Samuel abscond to Israel, respondent knew that his son had killed Mr. Tello and that the killing was considered by the police to be a murder. It is of no consequence to this disciplinary proceeding that Samuel professed that the killing was in self-defense. The fact remains that respondent knew that Samuel committed the homicide of Mr. Tello. Whether that killing was justified is for a jury to decide, *not* respondent. Respondent, by his own testimony, also knew that it was imminent that the police would seek out and arrest Samuel. He was fully aware that the investigation had focused on his house and his son because of the information contained in the application for a search warrant, which he had read. Respondent thoroughly planned his son's getaway. He brought his son's passport from Maryland to New York. As far as the record reveals, there is no evidence that his son even had a thought of fleeing to Israel until his father arrived in New York. Respondent was the person who first made the suggestion to his son.[12] Respondent then proceeded to purchase a plane ticket for his son and proceeded to make arrangements for his son to stay with relatives in Israel. All of these events took place *before* respondent sent his son to Israel, but *after* he knew his son had committed a homicide that was considered by the police to be a murder. Respondent relies mainly on the fact that he knew of no arrest warrant for his son at the time of his actions. However, he, himself, admitted that his son "was not on the run officially by the police—but would be; that's obvious." He was well aware of both the inappropriateness of his son's flight and of the impact it would have on Detective Hamill's criminal investigation.

In conclusion, we hold that respondent had the specific intent to obstruct or hinder the investigation and probable arrest of his son by sending him to Israel.

---

12. During respondent's Grand Jury testimony, the prosecutor directly asked respondent, "Whose idea was it to go to Israel?" Respondent replied, "It was mine."

## 2. Violation of Rule 8.4(b)

We hold that there was clear and convincing evidence that supports the hearing judge's conclusion that respondent committed the common law crime of obstructing or hindering a police officer.[13] We hold that respondent's conduct necessarily violates Rule 8.4(b). Rule 8.4(b) states:

"It is professional misconduct for a lawyer to:

. . .

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

Obstructing or hindering a police investigation of an alleged murder has a profound impact on a "lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." It is difficult to perceive that any other contention is even possible.

Types of crimes that we have held to violate Rule 8.4(b) include: (finding a violation of Rule 8.4(b) where an attorney was convicted of simple possession of cocaine) *Attorney Grievance Comm'n v. Black*, 362 Md. 574, 766 A.2d 119 (2001); (finding a violation of Rule 8.4(b) where the attorney was guilty of failure to pay income taxes) *Attorney Grievance Comm'n v. Atkinson*, 357 Md. 646, 745 A.2d 1086 (2000); (attorney violated Rule 8.4(b) by committing acts of domestic violence against his wife) *Attorney Grievance Comm'n v.*

---

**13.** Maryland Rule 16-759 requires that this Court conduct a "de novo" review of the hearing court judge's conclusions of law. The Rule then states that this Court "may" pay certain deference to the hearing judge's findings and conclusions if we choose to do so. We are not bound to them if there is clear and convincing evidence indicating additional findings are appropriate. The rule in paragraph (B) provides, as relevant to our discussion, that the "Court may confine its review to the findings of fact challenged by the exceptions." However, as to conclusions of law, the review is completely "de novo." In the case *sub judice* the charges were general, *i.e.*, that respondent had violated the provisions of Rule 8.4(b) and (d); without specifying particular criminal offenses respondent was alleged to have committed. "[T]he ultimate decision as to whether a lawyer has violated professional rules rests with this Court." *Gavin*, 350 Md. at 189, 711 A.2d at 200 (*citing Garland*, 345 Md. at 392, 692 A.2d at 469; *Breschi*, 340 Md. at 599, 667 A.2d at 663).

*Painter*, 356 Md. 293, 739 A.2d 24 (1999). In line with these cases, in the circumstances here present, a lawyer's ensuring that a police investigation is thwarted by sending a main suspect known by him to be the killer in a murder case to a distant country necessarily reflects adversely on that lawyer's trustworthiness.

### C. Rule 8.4(d)—Prejudice to the Administration of Justice

 Generally, this Court has found conduct to be prejudicial to the administration of justice in violation of Rule 8.4(d) when there has either been conduct that is criminal in nature or conduct that relates to the practice of law. In the case *sub judice*, we find that respondent's actions are so appalling that either shoe will fit; respondent's acts are both criminal in nature and directly harmful to the legal profession.

. A criminal conviction is not a prerequisite for finding a violation of Rule 8.4(d) and conduct prejudicial to the administration of justice. *Attorney Grievance Comm'n v. Breschi*, 340 Md. 590, 600, 667 A.2d 659, 664 (1995).[14] Based on our discussions, *supra*, of how respondent's actions constitute the crimes of obstructing and hindering a police officer, it necessarily follows that respondent's criminal conduct is prejudicial to the administration of justice in violation of Rule 8.4(d).

Finding respondent's criminal conduct prejudicial to the administration of justice finds support in a disciplinary proceeding from the state of Alaska, albeit, the attorney there being disbarred had been convicted of criminal offenses. In

---

14. Although respondent in this case has not been convicted of any crime, there are charges pending in Montgomery County. *See* Statement of Charges in *State of Maryland v. Sol Sheinbein*, District Court of Maryland for Montgomery, Case No. 6D00071133; an Arrest Warrant on Charging Document, Warrant No. D980442735 in *State of Maryland v. Sol Sheinbein*, District Court of Maryland for Montgomery County, Case No. 6D00071133; Application for Statement of Charges in *State of Maryland v. Sol Sheinbein*, Case No 6D00071133. Respondent is also a citizen of Israel and currently resides there.

the case at bar, respondent cannot be tried in Maryland because he remains in Israel. In *In re Webb*, 602 P.2d 408 (Alaska 1979), the Supreme Court of Alaska found an attorney's conviction for being an accessory after the fact to be inherently prejudicial to the administration of justice. In that case, the court said:

> "Duncan Webb's criminal conduct resulting in his conviction of the felony offense of accessory after the fact to first degree murder is a serious crime within the meaning of Rule 23 of the Alaska Bar Rules and constitutes engaging in illegal conduct involving moral turpitude in violation of DR 1–102(A)(3) of the Code of Professional Responsibility as well as engaging in conduct that is *prejudicial to the administration of justice* in violation of DR 1–102(A)(5) of the Code of Professional Responsibility."

*Id.* at 410 (emphasis added). That court went on to quote facts from Mr. Webb's criminal case in a footnote that said:

> " 'Webb did more than simply lie. After the commission of a most brutal and coldblooded murder, he concealed or aided the murderers with knowledge that they had committed first degree murder and with intent that they might avoid or escape from arrest, trial, or conviction.' "

*Id.* at 410, n. 10 (quoting *Webb v. State*, 580 P.2d 295, 304 (Alaska 1978)). Here, respondent did more than lie or hide the truth from Detective Hamill. He took intentional steps to improperly aid his son to avoid the consequences of his son's criminal conduct. Simply stated, his actions were prejudicial to the administration of justice.

Regardless of the criminal nature of respondent's actions, his thwarting of Detective Hamill's investigation was prejudicial to the administration of justice. "This Court has recognized that a lawyer is subject to professional discipline under the Rules of Professional Conduct for conduct the lawyer engages in outside his or her role as a lawyer." *Attorney Grievance Comm'n v. Childress* (*Childress I*), 360 Md. 373, 383, 758 A.2d 117, 122 (2000). "We have also held that a criminal conviction is not a condition precedent for a finding of

a violation of Rule 8.4(d) and conduct prejudicial to the administration of justice." *Id.* at 385, 758 A.2d at 123. In *Childress I,* we did not address the outer margins of Rule 8.4(d), as the admitted conduct was "arguably criminal conduct." *Id.* at 385–86, 758 A.2d at 123. We went on to say that the harm, or potential harm, from that respondent's conduct was "patent." *Id.* at 386, 758 A.2d at 123.

When we have found a lawyer's non-criminal conduct to prejudice the administration of justice, that lawyer's conduct generally concerned his or her own legal practice or relationship with his or her clients,[15] but this has not always been the case.[16] In the case *sub judice,* respondent's patent law practice and his clients appear to be unaffected by respondent's private actions, whether those actions are criminal or otherwise, in reference to his son's criminal plight. Taking a broad view of the situation allows us to see that it is clear that, although respondent's interference with Detective Hamill's

---

15. *See Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 624 A.2d 503 (1993) (finding a violation of Rule 8.4(d) where the lawyer had punished his clients and co-workers by spanking); *but see Childress I,* 360 Md. at 385, 758 A.2d at 123 (Where Judge Raker, for the court, wrote, "While it is true that a review of our cases might suggest that Rule 8.4(d) has been applied only to conduct which is related to the practice of law, directly or indirectly,' or where there has been a criminal conviction or conduct which is criminal in nature, in this case we need not address the margins of Rule 8.4(d) and whether a lawyer's non-criminal, purely private conduct might be a basis for discipline under the Rule").

16. *In Attorney Grievance Comm'n v. Richardson,* 350 Md. 354, 712 A.2d 525 (1998) we said:

"The respondent argues that to be conduct that is prejudicial to the administration of justice, the act must be one that hinders or otherwise interferes with a judicial proceeding of which he is a party or represents a party. This Court has never so narrowly defined Rule 8.4(d). We have instead recognized that conduct that impacts on the image or the perception of the courts or the legal profession, *see Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 536, 565 A.2d 660, 666 (1989) and that engenders disrespect for the courts and for the legal profession may be prejudicial to the administration of justice. Lawyers are officers of the court and their conduct must be assessed in that light."

*Id.* at 368, 712 A.2d at 532.

investigation does not directly affect his practice or clients, it has considerable consequences on other facets of the justice system.

By assisting his son in the egregious manner that he did, respondent essentially interfered with the natural progression of the criminal justice system. Instead of Detective Hamill completing a full investigation of respondent's son, turning the case over to the Montgomery County State's Attorney's Office for consideration of prosecution and, if prosecuted, ultimately having a jury of respondent's son's peers decide Samuel Sheinbein's fate, respondent effectively usurped the role of twelve Maryland citizens and substituted it with his own paternal instincts. Respondent made it impossible for the justice system to work. A jury of his peers may have believed that Samuel Sheinbein acted in self defense and might have rendered a verdict of not guilty. As a direct consequence of the actions of the respondent, we will never know how the Maryland criminal justice system would have treated Samuel Sheinbein. This is inappropriate.

This Court has long held lawyers to a higher standard of conduct than the average citizen. *See Attorney Grievance Comm'n v. Alison,* 317 Md. 523, 565 A.2d 660 (1989). In *Alison,* we stated:

"Upon admission to the Bar, a lawyer accepts and agrees to be bound by rules of conduct significantly more demanding than the requirements of law applicable to other members of society. As the Preamble to the Rules of Professional Conduct states:

'A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.

\* \* \* \* \* \*

'A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer

should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials.' "

*Id.* at 535, 565 A.2d at 665–66. In *Alison,* we found Mr. Alison's conduct, which included disorderly conduct, harassment, use of inappropriate language in court and verbal abuse of officers of the court, to be conduct that was prejudicial to the administration of justice. We said, "[t]hat such conduct does not at the moment of its occurrence delay the proceedings or cause a miscarriage of justice in the manner being tried is not the test. Conduct of this type breeds disrespect for the courts and for the legal profession." *Id.* at 536, 565 A.2d at 666. If a lawyer's belligerent conduct and improper interference with a court proceeding breeds contempt for the legal profession, so too must the serious improper perversion of the judicial process at the hands of a lawyer in the position in which respondent found himself. Inherent in an attorney's duty is the upholding of the law, even above his own or his family's interests. As such, "[p]ublic confidence in the legal profession is a critical facet to the proper administration of justice." *Attorney Grievance Comm'n v. Clark,* 363 Md. 169, 183, 767 A.2d 865, 873 (2001).

■ Here, a lawyer, who was familiar with the inner workings of the system and had sworn to uphold its laws, did everything in his power to ensure that his son circumvent that system and flee to another country, thus stalling an ongoing, legal police investigation and possible prosecution. Maryland has a paramount interest in maintaining the integrity of the judicial process of its courts. *See Alison,* 317 Md. at 537, 565 A.2d at 666 (*citing Cox v. Louisiana,* 379 U.S. 559, 563–64, 85 S.Ct. 476, 480–81, 13 L.Ed.2d 487, 492 (1965)). Respondent's actions totally stymied the criminal justice system and subsequently the judicial process in Maryland in respect to a serious criminal offense. It is difficult to see, as respondent suggests, how respondent's blatant interference with an ongoing police investigation "would not seriously impair public confidence in the entire legal profession" and not, as a result, impair public confidence in the integrity of the courts. When

an officer of the legal system improperly thwarts the mechanisms within it, he shows a disrespect for that system and the public confidence in the legal profession as a whole necessarily suffers a devastating blow. There can be no question that the public confidence in the legal profession has been adversely affected by respondent's conduct.

### III. Sanction

We enumerated the purposes behind and the factors to be considered in our sanctioning process in *Attorney Grievance Comm'n v. Clark* when we stated:

"This Court is mindful that the purpose of the sanctions is to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession. *See Attorney Grievance Comm'n of Maryland v. Hess*, 352 Md. 438, 453, 722 A.2d 905, 913 (1999) (*quoting Attorney Grievance Comm'n of Maryland v. Webster*, 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998)). We have stated that '[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed.' *Attorney Grievance Comm'n of Maryland v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997). Therefore, the appropriate sanction depends upon the facts and circumstances of each particular case, including consideration of any mitigating factors. *See Attorney Grievance Comm'n of Maryland v. Atkinson*, 357 Md. 646, 656, 745 A.2d 1086, 1092 (2000); *Attorney Grievance Comm'n of Maryland v. Gavin*, 350 Md. 176, 197–98, 711 A.2d 193, 204 (1998)."

*Clark*, 363 Md. at 183–84, 767 A.2d at 873. In addition, we have stated that "[i]mposing a sanction protects the public interest 'because it demonstrates to members of the legal profession the type of conduct which will not be tolerated.'" *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 96, 753 A.2d 17, 38 (2000) (*quoting Attorney Grievance Comm'n v. Ober*, 350 Md. 616, 631–32, 714 A.2d 856, 864 (1998)) (citation omitted).

■ This Court is not aware of any existing Maryland case that bears directly upon the appropriate sanction for conduct such as that in the case at bar, in that the facts here present are of first impression for this Court. However, a few instances where this Court held that disbarment was appropriate provide some guidance. We have consistently disbarred attorneys for the misappropriation of money. *See Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001) (disbarring attorney for misappropriation of funds unrelated to the attorney's practice of law); *Attorney Grievance Comm'n v. Sabghir*, 350 Md. 67, 710 A.2d 926 (1998) (disbarring attorney for misappropriation and fraud relating to money); *Attorney Grievance Comm'n v. Hollis*, 347 Md. 547, 702 A.2d 223 (1997) (disbarring attorney for misappropriating over $80,000); *Attorney Grievance Comm'n v. White*, 328 Md. 412, 614 A.2d 955 (1992) (disbarring attorney who misappropriated over $14,000 of client's money); *Attorney Grievance Comm'n v. Ezrin*, 312 Md. 603, 541 A.2d 966 (1988) (disbarring attorney for embezzling over $200,000 from his firm); and *Fellner v. Bar Association of Baltimore City*, 213 Md. 243, 131 A.2d 729 (1957) (disbarring attorney for inserting slugs in lieu of quarters in parking meters). We have also disbarred attorneys for various crimes. *See Maryland State Bar Ass'n v. Hirsch*, 274 Md. 368, 335 A.2d 108 (1975), *cert. denied*, 422 U.S. 1012, 95 S.Ct. 2638, 45 L.Ed.2d 676 (1975) (disbarring attorney for bribery); *Maryland State Bar Ass'n v. Agnew*, 271 Md. 543, 318 A.2d 811 (1974) (disbarring attorney for willful evasion of income taxes). This Court regards the interference with the judicial process resulting in a murder suspect escaping prosecution under Maryland law to be as serious, or even more so, than the aforementioned conduct.[17]

---

17. Respondent argues that we are not "dealing with something like misappropriation, drunk driving or drug abuse, where one need not be told that the conduct is wrong, it is clearly patently wrong, and reflects not only on the individual, but on the profession." This Court fails to see how a lawyer (or even the least educated citizen amongst us) needs to be told that assisting a suspect in a homicide investigation, who he knows committed the homicide, to flee the country is *anything but* patently wrong.

Our sister states of Colorado, Alaska and Oregon provide guidance more directly on point. While the seriousness of the underlying disputes are different, there are close similarities to the present case and *People v. Chappell,* 927 P.2d 829 (Colo.1996), where the Colorado Supreme Court disbarred an attorney who advised and materially assisted her client in a custody proceeding to flee the jurisdiction after the attorney learned that a court-appointed expert was recommending that her client's husband be granted sole custody. The attorney knew that the recommendation was not mandatory, but was likely to be followed by the court. The facts in *Chappell,* relevant to the case *sub judice* are:

> "[T]he respondent [attorney Lorraine Chappell] told her client that the court would probably accept Dr. LaCrosse's [the court appointed attorney] recommendations. The wife states that the respondent advised her as her attorney to stay, but as a mother to run. The respondent also informed her client about a network of safehouses for people in her situation, and helped her to liquidate her assets and empty her bank accounts. The respondent contacted a friend of her client and asked the friend to pack her client's belongings from the marital home and to put them in storage. The friend states that the respondent let her into the home with a key, and gave her money, provided to the respondent by her client, to pay for the moving and storage. The respondent kept the storage locker key according to the friend.

> "The respondent appeared for the temporary orders hearing on March 11, 1994 without her client. The respondent's request for a one week continuance was granted. Nevertheless, the court allowed the husband to testify concerning the temporary orders. The respondent argued against a change in the interim orders and stated that the child was doing well in his own home. When the trial judge questioned her as to the whereabouts of her client, the respondent replied that she was unable to answer because of the attorney-client privilege. The court then ordered an imme-

diate change of custody to the husband, as well as continued support payments....

. . .

"A permanent orders hearing was held in March 1995. The wife testified that the respondent had explained 'the underground' to her, had assisted in emptying her bank accounts, and had advised her on how to avoid being caught....

"The respondent's conduct violated R.P.C. 1.2(d) (a lawyer 'shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent'); R.P.C. 3.3(a)(2) (a lawyer shall not knowingly fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client); R.P.C. 8.4(b) (it is professional misconduct for a lawyer to commit a criminal act by aiding the lawyer's client to commit a crime); and R.P.C. 8.4(c) (it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation)."

*Id.* at 829–31 (alterations added). While *Chappell* involved a respondent who was convicted of a crime arising out of her conduct and made affirmative misrepresentations to a tribunal, the underlying conduct of respondent in the case at bar is essentially the same. Like respondent, Ms. Chappell conceived the idea for another to flee the jurisdiction, initiated the plan and affirmatively assisted the fugitive in obtaining her goal of remaining undetected. Ms. Chappell informed her client of the feasibility of fleeing Colorado, financially assisted her departure and helped with arrangements for places for her client to stay. Here, respondent did essentially the same thing. He came up with the plan, brought Samuel his passport, bought him an airline ticket to Israel and contacted his cousin there to set up a place for Samuel to stay. He also subsequently fled to Israel, placing himself beyond the easy reach of Maryland authorities.

We find further support in the case of *In re Webb,* 602 P.2d at 410, a case arising out of the Supreme Court of Alaska,

where that court disbarred an attorney for his conviction of accessory after the fact to murder. Mr. Webb lied to police on several occasions and aided the murderers, with knowledge of their crime, and "with intent that they might avoid or escape from arrest, trial, or conviction." *Webb v. State,* 580 P.2d at 304. Mr. Webb asserted that his actions were the direct result of duress, as he claimed the murderers threatened his life. The jury convicted him for accessory after the fact and the appellate court later said:

"It is true that Webb will probably be disbarred and, if so, will no longer be able to engage in the practice of law. He has brought great dishonor upon the legal profession. His criminal conduct, employing conscious dishonesty, deserves greater condemnation than if it were committed by one not obligated to adhere to high standards of honor and integrity."

*Id.* (footnote omitted). The subsequent disciplinary action, in turn, resulted in the disbarment of Mr. Webb for his actions in assisting felons to escape justice. *In re Webb,* 602 P.2d at 410.

In *In re Garvey,* 325 Or. 34, 932 P.2d 549 (1997), the Supreme Court of Oregon disbarred a lawyer engaged in serious criminal conduct, holding that the conduct was prejudicial to the administration of justice. While several claims of misconduct, including negligence with respect to several of his clients, were alleged against Mr. Garvey, the court found disbarment would have been appropriate even if only Mr. Garvey's criminal conduct was considered, as "Oregon lawyers who have engaged in serious criminal misconduct have been disbarred, whether or not they have been convicted of a crime." [18] *Id.* at 44, 932 P.2d at 553. In *Garvey,* the court found a serious crime had been committed when Mr. Garvey brought his client, inmate Jeff Gordon, money to facilitate his client's escape from jail and later lied about those facts under

---

18. The *Garvey* court said, "Application of those guidelines to the conduct of the accused establishes that under the ABA standards, the appropriate sanction here is disbarment, even without regard to the rule violations involving the Chavez and Garcia [non-criminal] matters." *Id.* at 44, 932 P.2d at 553 (alteration added).

oath. *Id.* at 39, 932 P.2d at 551. Although Mr. Garvey was convicted for his crimes, he failed to appear for his sentencing and was a fugitive from justice at the time of his disciplinary hearing. *Id.* at 40, 932 P.2d at 551. The Oregon court said:

"[T]he accused aided his client's escape from a correctional facility, thereby substantially harming the court procedures in that client's criminal case. In those ways, the accused's acts prejudiced the administration of justice.

. . .

"The criminal acts of the accused caused actual and substantial injury to the public and the legal system. He aided a client in breaking the law and lied to the grand jury."

*Id.* at 42, 932 P.2d at 552–53. Although Mr. Garvey's criminal conduct included lying under oath and assisting his client to escape from jail, it is essentially akin, in magnitude, to respondent's conduct of assisting his son to abscond to Israel. In the case *sub judice*, although yet to be convicted of a crime, (in part because respondent, like Mr. Garvey, is a fugitive), respondent knowingly and directly aided a murder suspect's fleeing from Maryland authorities.

Respondent argues that his situation presents "extenuating circumstances" that led to his abhorrent behavior. He focuses on the timing of the situation and that it precluded "mature reflection as to a 'proper' course of action." This argument neglects to mention the time and care respondent showed in devising an escape route for his son. He thought enough in advance to bring his son's passport from Maryland to New York City in contemplation of his son's need to leave the country. Respondent also suggests that he "cooperated" with the authorities by turning over information and evidence to the police, such as the car his son and Needle drove to New York and its contents, which included a shotgun, stun gun, and letters written by the two young men. This alleged "assisting" of Detective Hamill's investigation occurred only after respondent had encouraged and assisted his son to flee beyond

the reach of Maryland's jurisdiction. The prejudice to the administration of justice had already occurred.

Our own court's precedent, case law from our sister states, Bar Counsel's recommendation of disbarment and the unique and egregious factual scenario presented by respondent's utter abandonment of proper professional conduct in the face of the circumstances of Mr. Tello's murder leads this Court to only one conclusion: that respondent is no longer fit to practice law.

This is not a case of this Court passing moral or criminal judgment on a father for trying to protect his youngest son, nor is it the Court punishing a surrogate for a crime where the accused has escaped the reach of Maryland's law. In fact, respondent is currently beyond the reach of the state's jurisdiction. It is merely the process by which this Court protects the public from attorneys whose actions fly in the face of their legal obligations to the public and to their own profession. We shall disbar respondent.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT INCLUDING THE COSTS OF ALL TRANSCRIPTS PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST SOL SHEINBEIN.**

Dissenting Opinion by ELDRIDGE, J., in which RAKER, J., joins.

The majority today holds that Bar Counsel presented sufficient facts to establish that the respondent committed the crime of obstructing or hindering a police officer and that, therefore, his conduct violated MRPC 8.4(b).[1] The majority

---

1. Maryland Rule of Professional Conduct (MRPC) 8.4(b) provides that:

states that "[r]espondent's inappropriate conduct stems from sending his son to Israel with the knowledge that Samuel [his son] had committed a homicide in Maryland." Furthermore, the majority also finds respondent's actions to be "so appalling" and "egregious" that his conduct is prejudicial to the administration of justice in violation of MRPC 8.4(d).[2] In fact, the extreme language and tone of the majority opinion might lead a reader to conclude that the respondent was the one who committed the homicide. Despite the majority's characterizations of the respondent's conduct, I do not believe that his conduct, when viewed separately from the underlying crime committed by his son, constitutes misconduct by a criminal act under MRPC 8.4(b) or conduct prejudicial to the administration of justice under MRPC 8.4(d).

## I.

As stated by the majority, quoting from *Attorney Grievance Comm'n v. Gavin*, 350 Md. 176, 189, 711 A.2d 193, 200 (1998), under the Maryland Rules, " '[t]his Court has original and complete jurisdiction over attorney disciplinary proceedings.' "[3] In our independent review of the record, we must

_____

"It is professional misconduct for a lawyer to:
\* \* \*
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;"

**2.** MRPC Rule 8.4(d) provides:
"It is professional misconduct for a lawyer to:
\* \* \*
(d) engage in conduct that is prejudicial to the administration of justice."

**3.** The rules promulgated by this Court purport to give us original jurisdiction over contested adjudicatory attorney disciplinary cases, and we have regularly exercised such trial court jurisdiction, entering money judgments and equitable decrees when there were no prior judgments or decrees by a court.

The Constitution of Maryland, however, gives this Court original jurisdiction in only two situations, set forth in Article II, § 6, and Article III, § 5. Neither provision encompasses attorney disciplinary cases. Except for those two situations, the cases have uniformly held

determine whether the findings of the hearing judge, Judge Pincus, are based upon clear and convincing evidence. Under ordinary circumstances, a "hearing court's findings of fact are *prima facie* correct and will not be disturbed unless they are shown to be clearly erroneous." *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997). Such deference is paid because "[t]he hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe and . . . to pick and choose which evidence to rely upon." *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 390, 794 A.2d 92, 101 (2002). Usually, it is the hearing judge who is uniquely positioned to evaluate all aspects of a witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication. These factors may convince the observing judge whether the witness is testifying truthfully or falsely. These

---

that the Court of Appeals may exercise appellate jurisdiction only. This Court has consistently held that enactments purporting to confer original jurisdiction on the Court of Appeals or the Court of Special Appeals are unconstitutional. *Shell Oil Co. v. Supervisor,* 276 Md. 36, 40–44, 343 A.2d 521, 523–525 (1975), and cases there collected.

The rules purporting to confer original jurisdiction on this Court in contested attorney disciplinary cases present another constitutional problem relating to the jurisdiction of Maryland courts. Under those rules, a petition for disciplinary action is referred to a judge of a circuit court to hold a hearing, make findings of fact, and make conclusions of law. The circuit court judge, however, is not empowered to decide the case. Instead, the trial judge forwards the findings and conclusions to another body (*i.e.,* this Court), and that other body renders the decision. *See* Maryland Rules 16–752 through 16–759. In *Duffy v. Conaway,* 295 Md. 242, 455 A.2d 955 (1983), this Court held that a similar scheme, whereby a circuit court judge collected evidence and found facts for another body, but where the circuit court judge was not empowered to render a decision, violated the Maryland Constitution and that, therefore, the circuit court judge had no jurisdiction in the case.

We have never attempted to reconcile the rules conferring original jurisdiction on the Court in contested attorney disciplinary cases with the holdings in *Shell Oil Co. v. Supervisor, supra,* and *Duffy v. Conaway, supra,* although jurisdiction is an issue which we will address even if not raised by a party. One day, perhaps, the Court will address the matter.

same factors, however, are entirely unavailable to a reader of the transcript. Cold paper records supply none of this information.

Thus, contrary to the majority's view, the instant case does not require us to give the normal deference to the hearing judge's findings on the respondent's credibility. Because the respondent was not present at the hearing below, Judge Pincus based his credibility determinations solely upon the transcript of the respondent's testimony at the Grand Jury proceedings, the same cold record before us today. As such, the members of this Court are just as capable of assessing the respondent's credibility as the hearing judge, and no special deference is warranted for Judge Pincus's findings concerning the respondent's credibility.

The majority also overlooks the principle that "[t]he 'clear and convincing' standard of Rule [BV10 d] applies to the measure of proof imposed upon the Attorney Grievance Commission in factual determinations essential to establishing its case against the attorney. * * * It does not apply to factual matters sought to be established by the attorney in defense of the attorney's position. . . . As to this, the preponderance of evidence standard is the applicable measure of proof." *Attorney Grievance Comm'n v. Bakas*, 322 Md. 603, 606, 589 A.2d 52, 53 (1991), quoting *Attorney Grievance Comm'n v. Bailey*, 285 Md. 631, 644, 403 A.2d 1261, 1268 (1979). *See also Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 99 n. 13, 797 A.2d 757, 765 n. 13 (2002). Therefore, while it is incumbent upon Bar Counsel to prove each of the charges by clear and convincing evidence, respondent need only establish facts in his defense by a preponderance of the evidence.

.II.

As discussed above, when alleging that an attorney's actions violate the MRPC by constituting a crime, the standard of proof imposed upon Bar Counsel is to prove each element of

the offense by clear and convincing evidence.[1] *See Attorney Grievance Comm'n v. Childress*, 364 Md. 48, 55, 770 A.2d 685, 689 (2001). In light of this standard, the evidence presented by Bar Counsel was insufficient to establish the requisite specific intent to hinder Detective Hamill in the performance of her investigation. Moreover, I strongly doubt that the respondent's actions constituted the offense of hindering or obstructing a *police officer*. Instead, the effect of the respondent's conduct, at most, was to prevent or delay a homicide prosecution by the *State's Attorney* in Montgomery County in favor of a homicide prosecution, a conviction, and a 24–year prison sentence in Israel.

We noted in *Cover v. State*, 297 Md. 398, 400, 466 A.2d 1276, 1277 (1983), that, although the crime of hindering a police officer in the performance of the officer's duties was a statutory one in many States, it remained a common law offense in Maryland. *See also DiPino v. Davis*, 354 Md. 18, 32, 729 A.2d 354, 361 (1999); *Busch v. State*, 289 Md. 669, 675, 426 A.2d 954, 957 (1981); *Roddy v. Finnegan*, 43 Md. 490, 505 (1876); *Howard v. State*, 32 Md.App. 75, 82, 359 A.2d 568, 573 (1976). Determining the scope of the crime of "hindering," "obstruction," or "interfering" is difficult, however, as the cases addressing this offense do not make any attempt to define or circumscribe the precise types of activities included in these vague terms.[5]

---

**4.** "The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term 'clear and convincing' evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence." *Attorney Grievance Comm'n v. Harris*, 366 Md. 376, 389, 784 A.2d 516, 523 (2001), quoting *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 79, 753 A.2d 17, 29 (2000).

**5.** For a general treatment on what types of acts have been deemed obstruction or hindering, *see* Note, *Types of Activity Encompassed by the Offense of Obstructing a Public Officer*, 108 U. Penn. L.Rev. 388 (1960).

Thus, the *Cover* Court, in analyzing whether the State had proven the elements of the crime of obstruction or hindering a police officer, found it helpful to separate conduct capable of hindering a police officer into three categories, moving progressively from the more direct obstructions to the more attenuated ones. The Court in *Cover*, 297 Md. at 405–406, 466 A.2d at 1280, quoting Lidstone, *The Offence of Obstruction: (2) Obstructing Freedom?*, [1983] Crim. L.Rev. 29, stated (footnotes omitted):

"Positive direct obstruction: '[T]hose cases in which the constable acts directly against the citizen or his property and is physically resisted.' *Id.* at 30.

"Passive direct obstruction: Those cases 'in which the constable seeks to make the citizen act directly, and the citizen refuses or fails to act as required.' *Id.*

"Positive indirect obstruction: Those cases in which 'the police are not acting directly against the citizen but are acting indirectly against other citizens who are, or may be, about to commit offences against the criminal law, and the citizen does an act which obstructs them in their general duty to prevent or detect crime, intending to frustrate the police operation.' *Id.*"

In the case at bar, the charged conduct at issue falls into this last attenuated category—an alleged indirect hindering.

The only actions of the respondent, forming the basis for the majority's conclusions, are respondent's "assist[ing] his son to circumvent the law by absconding." Bar Counsel had also alleged that respondent's failure to notify Detective Hamill of his contacts with Samuel was an omission hindering Detective Hamill in the performance of her duties. This notion can be disposed of by noting that when these actions transpired, it is undisputed that the respondent had not been notified that an arrest warrant had issued for Samuel Sheinbein. Detective Hamill testified that respondent's attorney, Paul T. Stein, was informed of the arrest warrant the day after Samuel went to Israel. Until an arrest warrant issued, there was no legal duty imposed upon the respondent to

inform Detective Hamill of his son's contacts and whereabouts. As such, this omission cannot be the basis of the second element of the charge of obstruction or hindering. The cases finding an obstruction or hindering resulting from an omission or failure to follow police instructions are clearly distinguishable. These cases typically involve refusal to follow an officer's order to move or disperse. *See, e.g., City of Chicago v. Meyer,* 44 Ill.2d 1, 253 N.E.2d 400 (1969), *cert. denied,* 397 U.S. 1024, 90 S.Ct. 1262, 25 L.Ed.2d 534 (1970); *City of Chicago v. Lynd,* 47 Ill.2d 205, 265 N.E.2d 116 (1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1383, 28 L.Ed.2d 662 (1971).

After a comprehensive review of the obstruction or hindering cases, this Court in *Cover v. State, supra,* 297 Md. at 413, 466 A.2d at 1284, articulated the elements of the offense:

"(1) A police officer engaged in the performance of a duty;

"(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

"(3) Knowledge by the accused of facts comprising element (1); and

"(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2)."

Furthermore, we acknowledged that it is often difficult to determine what acts or omissions constitute obstructing or hindering the performance of an officer's duty. *Ibid.*

The respondent does not challenge the establishment of the first and third elements of the offense, namely that Detective Hamill was a police officer engaged in the performance of her duties and that respondent had knowledge of her involvement in the matter. Nevertheless, Bar Counsel failed to establish the second element, *i.e.,* an act or omission that obstructs or hinders, and the fourth element, *i.e.,* a specific intent to hinder or obstruct.

## A.

The underlying case against respondent's son presented a situation where two different sovereigns had jurisdiction to prosecute Samuel Sheinbein for his involvement in the homicide.[6] Without question, the State of Maryland had jurisdiction to prosecute Samuel based on territoriality. Under this concept, Maryland had plenary power to make its substantive laws applicable to any person or occurrence within its territorial boundaries and plenary power to enforce its laws within its territorial boundaries. Additionally, however, the State of Israel had jurisdiction to prosecute Samuel based on his Israeli nationality.[7] As a basis for the jurisdiction to prescribe, the nationality principle historically referred to a nation's authority to control the conduct of its citizens, no matter where that conduct took place. *See* Restatement (Third) of Foreign Relations Law of the United States, § 402(2) (1987).

---

**6.** A state needs two types of jurisdiction in order to prosecute an individual: jurisdiction to prescribe and jurisdiction to enforce. *See* Restatement (Third) of Foreign Relations Law of the United States, pt. IV introductory note (1987). Jurisdiction to prescribe is "the authority of a state to make its substantive laws applicable to particular persons and circumstances." *Ibid.* Jurisdiction to enforce is the authority of a state to use its resources "to induce or compel compliance with its law[s]". *Ibid.* For a thorough discussion, *see* Barry E. Carter & Philip R. Trimble, *International Law* 712–801 (3d ed.1999). *See also* Rest. (Third) of Foreign Relations Law, *supra*, § 401.

**7.** Under principles of Customary International Law, nationality is obtained in different ways. *Jus Soli* refers to laws that confer nationality because of birth in a state's territory. *Jus Sanguinis* refers to laws that accord nationality based on birth to parents who are nationals of that State. On February 25, 1999, the Israeli Supreme Court held that Samuel Sheinbein could not be extradited to the United States. This ruling was based on the passage of a 1978 amendment to Israel's Extradition Law prohibiting extradition for offenses committed after an individual has obtained Israeli nationality. This decision led to Samuel Sheinbein's ultimate conviction for premeditated murder on September 2, 1999, by the Tel Aviv District Court, and sentencing on October 25, 1999, to twenty-four years in prison, the longest sentence ever imposed on a juvenile in Israeli history. Under the Act of State Doctrine, this Court is not at liberty to inquire into the validity of the Israeli courts' holdings. The rulings that Israel had jurisdiction to prosecute the homicide are binding upon us. *See generally Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

*See also Blackmer v. United States,* 284 U.S. 421, 437 n. 2, 52 S.Ct. 252, 254 n. 2, 76 L.Ed. 375, 382 n. 2 (1932).

Thus, the question inevitably arises, in a situation where two sovereigns have jurisdiction over a particular offense, whether an attorney or parent, who has counseled his or her client or child to proceed to the jurisdiction with the lesser penalty, has committed any misconduct? The answer to this question is clearly "No." Submission to custody in one jurisdiction, whether the result of an attorney's advice, or a parent's advice, or the client's uncounseled choice, or a decision by the Attorney General, necessarily hinders prosecution in the other jurisdiction. Hence, even assuming *arguendo* that the respondent had sent his son to Israel with the specific intent of opting for Israel's prosecution over prosecution in Maryland, the action is not criminal. In sum, respondent's "devising and facilitating his son's departure to Israel," in the language of the majority opinion, does not bring him within the ambit of the offense of obstruction or hindering.

Indeed, when more than one sovereign has jurisdiction to prosecute a person for homicide, it appears to be entirely appropriate for those on the prosecution side to send the alleged perpetrator to the sovereign likely to impose the most severe punishment.[8] According to the majority opinion, however, it is not appropriate for those on the defense side to send the alleged perpetrator to the sovereign likely to impose a less severe punishment. If prosecutors are free to forum-shop for a jurisdiction with more severe penalties, or a broader capital punishment statute, when choosing where to prosecute the accused, the defense should not be punished for sending the accused to a jurisdiction with less severe maximum penalties.

---

**8.** *See* Susan Schmidt and Josh White, *Sniper Suspects Handed to Va. for Trials,* WASH POST. Nov. 8, 2002, at A1, reporting that the decision to prosecute sniper suspects John Allen Muhammad and John Lee Malvo in Virginia instead of Maryland was "based on which jurisdictions had the best law, the best facts and the best range of available penalties." (Internal quotations omitted).

It would be a different case if there were any evidence in the record that the respondent had either tried to evade prosecution in Israel or had sent his son to a country with no jurisdiction to prosecute the homicide.[9] But that is not the case before us. Not only did the respondent dispatch his older son, Robert, to bring Samuel back to Maryland to face charges, but once Samuel arrived in Israel, there was no attempt to hide him from the Israeli authorities, or to send him out of Israel to any number of neighboring countries. It was only a matter of days before the Israeli police took custody of Samuel, unobstructed and unhindered.[10]

Additionally, the majority claims that the respondent's conduct "denied Detective Hamill any opportunity to pursue investigatory leads." Yet, the respondent allowed Detective Hamill to execute the search warrant at his home and cooperated with her by providing her with Samuel's credit card number, as well as his son's cellular phone number. In light of these facts, the only other "investigatory leads" for Detective Hamill to cull would result from questioning Samuel.

Two points should be made with regard to this. First, even if the respondent had contacted Detective Hamill upon hear-

---

9. The respondent's Grand Jury testimony reveals that, when he sent his son Robert to Israel to bring Samuel back, Samuel pleaded with his father, "[c]an't you send me to a country where they can't catch me? Can't you send me to Libya, Iraq?" *See* respondent's Grand Jury Testimony at 72. There is no evidence that such a plan was ever contemplated by the respondent. Nonetheless, the majority opinion is written as if the respondent did send Samuel to a place where he could not be prosecuted.

10. Compare this case to the homicide case against former hippie guru Ira Einhorn. In that case, the defendant fled the United States on the eve of his trial in Philadelphia, in 1981. Using different aliases, he successfully evaded detection for sixteen years in Europe before being arrested in France in 1997. He was returned to the United States in July 2001, but only after prosecutors agreed to a French request not to seek the death penalty and to have his 1993 first-degree murder conviction *in absentia* vacated by means of special legislation passed by the Pennsylvania Legislature. The legal saga ended with his conviction on October 17, 2002. *See* Jacqueline Soteropolous, *Ira Flops With Jury*, Phila. Inquirer, Oct. 18, 2002, at A1; Maida Cassandra Odom, *Einhorn "Looking Forward" To Testifying*, Boston Globe, Sept. 22, 2002 at A11.

ing from his son, the likelihood that any attempt at questioning Samuel would have elicited investigatory leads is remote. Unlike a witness, who can be compelled to testify under the sanction of contempt, Samuel was free to invoke his constitutional privilege against self-incrimination, and likely would have, as his entire family had done prior to the respondent's testifying before the Grand Jury. *See* Findings of Fact and Conclusions of Law at 6. This is especially likely since the record reflects that the respondent retained an attorney, Paul T. Stein, for his son the morning after the search warrant was executed. Under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), even if the opportunity for questioning Samuel had presented itself, once the arrest warrant issued Detective Hamill could not have questioned Samuel without his attorney present. Thus, with his attorney present during questioning, it is extremely doubtful that Samuel would have given Detective Hamill any investigatory leads.

Secondly, it bears repetition that, at most, the effect of the respondent's conduct was to prevent or delay a homicide prosecution by the State's Attorney in Montgomery County in favor of a prosecution, conviction, and sentencing in Israel. Samuel's departure to Israel on the evening of September 21st could not have "denied Detective Hamill any opportunity to pursue investigatory leads," because the record reveals that the arrest warrant was issued on September 20th. By the time Samuel departed, Detective Hamill's investigation was complete; the evidence necessary for an arrest had already culminated into a warrant, and the State's case against Samuel Sheinbein had entered the prosecution phase. Although a Maryland State's Attorney may have been hindered in prosecuting a high profile case, there simply was no hindering of a police officer.[11]

---

11. As to the "high profile" nature of the case, it should be noted that Bar Counsel, in oral argument before this Court, in response to a question concerning the delay in bringing the case, stated: "when the publicity came up, I remember reading it in the paper and I opened a Bar Counsel file on the strength of that...."

## B.

Another necessary element of obstruction or hindering a police officer is the "[i]ntent to obstruct or hinder the officer by the act or omission constituting [the second] element." *Cover v. State, supra,* 297 Md. at 413, 466 A.2d at 1284. Here, a holding of obstruction or hindering must turn on whether Bar Counsel established, by clear and convincing evidence, that respondent had the requisite specific intent to hinder Detective Hamill's investigation by sending Samuel to Israel. We have recently explained the meaning of specific intent in *Chen v. State,* 370 Md. 99, 111 n. 5, 803 A.2d 518, 524 n. 5 (2002), quoting *Harris v. State,* 353 Md. 596, 603, 728 A.2d 180, 183 (1999):

> " '[S]pecific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act.' " (Additional quotation marks omitted).

Thus, in this case, the mere act of sending Samuel to Israel alone is not enough. It must be shown, by clear and convincing evidence, that the respondent sent Samuel to Israel with the conscious purpose of frustrating Detective Hamill's investigation.

The respondent's Grand Jury testimony discloses that his actual intent in sending Samuel to Israel was (a) to prevent him from committing suicide; (b) to distance his son from the influence of Aaron Needle; and (c) to avert the possibility of a violent confrontation with the police. His testimony also reveals that he implored his son to surrender to the Maryland police but that Samuel was adamant in his refusal to do so. Moreover, the respondent further testified before the Grand Jury that, upon being apprised of the issuance of an arrest warrant, he sent his eldest son, Robert, to Israel to collect

Samuel and bring him back to Maryland to face the authorities. Given the confluence of factors that presented themselves in a relatively short period of time, respondent claims that he had little time for reflection. He then stated, "I took his passport with me in the event nothing else worked." Respondent's Grand Jury Testimony at 66–67.

Based on his reading of the respondent's Grand Jury testimony, the hearing judge found that the testimony of the respondent's actual intent was not credible. The judge relied on the oft-quoted presumption that "a person intends the natural and probable consequences of his acts. Thus, the requisite criminal intent may be inferred from the defendants' voluntary and knowing commission of an act which is forbidden by law or from the defendant's omission to do an act required by law." As explained earlier, however, the respondent did not commit an act forbidden by law nor did he omit to do an act required by law. Additionally, Israel's ultimate refusal to extradite was neither a natural nor probable consequence of the respondent's sending his son there. Finally, since the hearing judge could only look to the transcript from the Grand Jury, his finding with respect to the respondent's credibility is not entitled to any special deference.

The majority nevertheless states that "[t]he record is replete with facts" supporting the hearing judge's finding that the respondent was not credible in testifying before the Grand Jury about his actual intent. Among other things, the majority claims that two separate comments made by the respondent during his Grand Jury testimony undermine his credibility. First, the majority cites the following exchange (respondent's Grand Jury Testimony at 69.):

"Q[uestion of prosecutor] Okay. Now Sunday night, obviously, the trip is set up for Samuel to go to Israel. When did Robert go to Israel?

A[nswer of respondent] Okay. On Monday, we decided that there was no—on Sunday, there was no arrest warrant whatsoever for Samuel, none whatsoever; that he was not a

wanted person, he was not a fugitive. He was not on the run officially by the police—

Q Right.

A—but he would be; that's obvious."

From this exchange, the majority asserts that the respondent "plainly admitted" that he knew his son would "obviously" be on the run from an arrest warrant. Yet, the phrase "but he would be; that's obvious" is susceptible to various interpretations. It may just mean that it was obvious, in hindsight, that his son would be wanted by the police. This equivocal phrase is hardly enough to meet Bar Counsel's burden to clearly and convincingly prove that the respondent intended to hinder Detective Hamill's investigation.

The second bit of testimony relied on by the majority, as support for the hearing judge's finding on the respondent's credibility, relates to the purchase of Samuel's airline ticket. In response to a question about how Samuel's voyage was financed, the respondent stated, "I went to Tower Air in New York City, and I purchased the ticket, a one-way ticket—well, a round-trip ticket is cheaper than a one-way—on Tower Air." Respondent's Grand Jury Testimony at 67. The majority declares that this statement alone discredits the respondent's argument that he purchased a round-trip ticket in contemplation of Samuel's return. But this misses the point. Even if the respondent's purchase of a round-trip ticket was based solely on the price differential, this does not demonstrate by clear and convincing evidence that the respondent did not contemplate his son's return once the immediate crisis had diffused. Indeed, the facts that developed in the days immediately following Samuel's departure refute the majority's theory. It is undisputed that the respondent sent his son, Robert, to Israel to bring Samuel back to this country. The obstacle to Samuel's return was not the want of a return ticket.

Next, the majority argues that, because Samuel was alone when he met with his family in New York City, he was no longer in imminent danger of being under Aaron Needle's unwanted influence. Yet, the respondent's Grand Jury testi-

mony reveals a long history of distrust toward Mr. Needle, which was no doubt resurrected and exacerbated by the present circumstances. Moreover, the respondent was aware that his son had driven to New York with Mr. Needle; consequently, although Mr. Needle was not present at the family meeting, he probably was not very far away. Thus, I fail to discern any evidence casting doubt upon the respondent's credibility when he claimed that he wanted to distance his son from Mr. Needle.

Finally, the majority contends that there was no "apparent imminent danger of [Samuel] committing suicide" in the presence of his family in New York. This is especially true, the majority argues, because Samuel had surrendered the shotgun to the respondent upon the family's arrival. Under the circumstances, however, it is reasonable that the respondent was truly concerned that his son would take his own life. The respondent was well aware that his son had been involved in a grisly homicide, whether or not in self-defense, and that Samuel was not thinking clearly at this time. The fact that Samuel was no longer in possession of the shotgun only eliminated one means of killing himself. So long as Samuel was still expressing suicidal thoughts, it is credible that the respondent, as his father, was distressed over the possibility of his son's suicide. Albeit in hindsight, I am also mindful of the fact that Mr. Needle, who likewise had expressed suicidal inclinations in New York, ultimately hanged himself on April 18, 1998, two days before jury selection was to begin in his trial.

There must be *affirmative*, clear and convincing evidence of the respondent's specific intent to hinder a police officer. That is, even if the respondent's testimony as to his intent is not deemed credible, this legal conclusion cannot supplant the affirmative showing, by clear and convincing evidence, that Bar Counsel must establish with regard to his specific intent. It is a well-settled principle in the law that lack of credibility, without more, is not *ipso facto* affirmative evidence sufficient to meet a proponent's burden of proof on an intent element in a charge. *See, e.g., VF Corp. v. Wrexham Aviation Corp.*, 350

Md. 693, 711, 715 A.2d 188, 196 (1998) (The finder of fact's "prerogative not to believe certain testimony, however, does not constitute affirmative evidence of the contrary"); *Attorney Grievance Comm'n v. Clements*, 319 Md. 289, 298, 572 A.2d 174, 179 (1990) ("A refusal to believe evidence of a respondent, however, does not, of itself, supply affirmative evidence of the . . . [misconduct] charged").

Furthermore, on the basis of the Grand Jury testimony, the hearing judge had little basis for determining whether the respondent was telling the truth. The record is not so much "replete" with facts supporting a finding of non-credibility, as it is replete with cold-record testimony susceptible of various interpretations. Therefore, I conclude that Bar Counsel did not present clear and convincing evidence of a specific intent to hinder or obstruct Detective Hamill's investigation.

In sum, Bar Counsel did not provide proof, by clear and convincing evidence, that respondent committed the common law offense of obstruction or hindering a police officer. I do not agree that an attorney or father has criminally obstructed or hindered police activity in the case where two jurisdictions have the authority to prosecute an offense, and the attorney advises his client, or the father advises his son, to go to the jurisdiction with the less severe sanction. Moreover, when the only "hindering" is to frustrate the questioning of one who has been accused of a crime, and who is certain to invoke the privilege against self-incrimination, I do not believe that the offense of hindering has occurred. Nor do I believe that Bar Counsel proved, by clear and convincing evidence, that the respondent had the requisite intent to hinder Detective Hamill in the course of her duties. Consequently, no misconduct by a criminal act, in contravention of MRPC 8.4(b), is present in this case.

## III.

The majority also concludes that the respondent violated MRPC 8.4(d) by engaging in conduct that is prejudicial to the administration of justice. Generally, this Court has found

conduct to be in violation of Rule 8.4(d) under two circumstances: First, when there has been conduct that is criminal in nature, or second, when the lawyer's conduct concerned his own legal practice or his relationship with his clients.[12] This is

---

**12.** A survey of cases alleging a violation of Rule 8.4(d) or its predecessor, DR 1–102(A)(5), brought before this Court in the past ten years, reveals that, during that period, no attorney has been found in violation of Rule 8.4(d) unless his conduct was either criminal or involved his legal practice or clients.

The following cases found a violation of 8.4(d) due to the respondent's conduct being criminal: *Attorney Grievance Comm'n v. Childress*, 364 Md. 48, 770 A.2d 685 (2001) (pursuing a child on the Internet); *Attorney Grievance Comm'n v. Waters*, 2001 Md. LEXIS 864 (2001) (willful failure to file his income tax returns); *Attorney Grievance Comm'n v. Angst*, 369 Md. 404, 800 A.2d 747 (2002) (failure to fulfil statutory obligations as an employer to withhold employees' state income taxes and to pay amounts owed to the Comptroller, failure to file the appropriate returns when due); *Attorney Grievance Comm'n v. Clark*, 363 Md. 169, 767 A.2d 865 (2001) (repeated failure to timely file withholding tax returns, to remit the taxes withheld, and to hold the withheld taxes in trust); *Attorney Grievance Comm'n v. Black*, 362 Md. 574, 766 A.2d 119 (2001) (conviction for possession of cocaine); *Attorney Grievance Comm'n v. Childress*, 360 Md. 373, 758 A.2d 117 (2000) (pursuing a child on the Internet); *Attorney Grievance Comm'n v. Dechowitz*, 358 Md. 184, 747 A.2d 657 (2000) (conviction for possession with intent to distribute marijuana); *Attorney Grievance Comm'n v. Atkinson*, 357 Md. 646, 745 A.2d 1086 (2000) (failure to file taxes); *Attorney Grievance Comm'n v. Bereano*, 357 Md. 321, 744 A.2d 35 (2000) (mail fraud conviction); *Attorney Grievance Comm'n v. Painter*, 356 Md. 293, 739 A.2d 24 (1999) (convictions for battery and transporting a handgun in a domestic violence context); *Attorney Grievance Comm'n v. Gilbert*, 356 Md. 249, 739 A.2d 1 (1999) (conviction for possession of crack cocaine); *Attorney Grievance Comm'n v. White*, 354 Md. 346, 731 A.2d 447 (1999) (perjury); *Attorney Grievance Comm'n v. Gavin*, 350 Md. 176, 711 A.2d 193 (1998) (failure to file timely tax returns and to pay timely income taxes); *Attorney Grievance Comm'n v. Post*, 350 Md. 85, 710 A.2d 935 (1998) (failure to file taxes); *Attorney Grievance Comm'n v. Garland*, 345 Md. 383, 692 A.2d 465 (1997) (conviction for driving under the influence of alcohol); *Attorney Grievance Comm'n v. Breschi*, 340 Md. 590, 667 A.2d 659 (1995) (failure to file taxes); *Attorney Grievance Comm'n v. Casalino*, 335 Md. 446, 644 A.2d 43 (1994) (conviction for tax evasion); *Attorney Grievance Comm'n v. Boyd*, 333 Md. 298, 635 A.2d 382 (1994) (material misrepresentation respecting trust account to another attorney with intent to deceive); *Attorney Grievance Comm'n v. James*, 333 Md. 174, 634 A.2d 48 (1993) (forgery); *Attorney Grievance Comm'n v. White*, 328 Md. 412, 614 A.2d 955 (1992) (misappropriation of client funds).

The following cases found a violation of 8.4(d) based on conduct that concerned the attorney's own legal practice or the attorney's relationship with his or her clients: *Attorney Grievance Comm'n v. Gallagher,* 371 Md. 673, 810 A.2d 996 (2002) (misappropriation of client funds); *Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 810 A.2d 457 (2002) (failure to adequately represent a client); *Attorney Grievance Comm'n v. Barneys,* 370 Md. 566, 805 A.2d 1040 (2002) (unauthorized practice of law); *Attorney Grievance Comm'n v. Santos,* 370 Md. 77, 803 A.2d 505 (2002) (commingling client funds into operating account); *Attorney Grievance Comm'n v. Sullivan,* 369 Md. 650, 801 A.2d 1077 (2002) (failure to administer estate promptly, dishonest and unlawful taking of client funds, and lack of communication with successor personal representatives); *Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 800 A.2d 782 (2002) (misuse of attorney trust account); *Attorney Grievance Comm'n v. McCoy,* 369 Md. 226, 798 A.2d 1132 (2002) (commingling of client funds); *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 797 A.2d 757 (2002) (representation of clients impaired by drug addiction); *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 795 A.2d 706 (2002) (neglect of client matters); *Attorney Grievance Comm'n v. Wallace,* 368 Md. 277, 793 A.2d 535 (2002) (neglect of client matters); *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 793 A.2d 515 (2002) (misuse of trust account); *Attorney Grievance Comm'n v. Lane,* 367 Md. 633, 790 A.2d 621 (2002) (failure to act diligently on client's behalf); *Attorney Grievance Comm'n v. Harrington,* 367 Md. 36, 785 A.2d 1260 (2001) (flagrant failure to respond to inquiries from Bar Counsel); *Attorney Grievance Comm'n v. Harris,* 366 Md. 376, 784 A.2d 516 (2001) (incompetent representation of clients); *Attorney Grievance Comm'n v. Johnson,* 363 Md. 598, 770 A.2d 130 (2001) (making false statements to tribunal, acting against interests of clients); *Attorney Grievance Comm'n v. Bernstein,* 363 Md. 208, 768 A.2d 607 (2001) (willful invasion of client funds); *Attorney Grievance Comm'n v. Shaw,* 363 Md. 1, 766 A.2d 1028 (2001) (misconduct involving charges for attorney fees); *Attorney Grievance Comm'n v. Zdravkovich,* 362 Md. 1, 762 A.2d 950 (2000) (failure to represent a client in an adequate manner); *Attorney Grievance Comm'n v. Koven,* 361 Md. 337, 761 A.2d 881 (2000) (incompetent representation of clients, not refunding unearned fees, accepting payment for work not performed); *Attorney Grievance Comm'n v. Bridges,* 360 Md. 489, 759 A.2d 233 (2000) (repeatedly refusal to provide information requested by Inquiry Panel regarding attorney's involvement with employee); *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 753 A.2d 17 (2000) (inadequate representation of client); *Attorney Grievance Comm'n v. Harper,* 356 Md. 53, 737 A.2d 557 (1999) (unauthorized practice of law); *Attorney Grievance Comm'n v. Brugh,* 353 Md. 475, 727 A.2d 913 (1999) (neglect in client matters, inadequate representation of clients); *Attorney Grievance Comm'n v. Brown,* 353 Md. 271, 725 A.2d 1069 (1999) (failure to respond to Attorney Grievance Commission's inquiries about a client matter); *Attorney Grievance Comm'n v. Brennan,* 350 Md. 489, 714 A.2d 157 (1998) (attorney had working relationship with a suspended attorney and mishandled client matters); *Attorney Grievance Comm'n v. Richardson,* 350 Md. 354, 712 A.2d 525 (1998) (filing frivolous and malicious lawsuit against judges who had ruled against him in previous

consonant with the guidance set forth in the Comments to the ABA Model Rules of Professional Conduct (MODEL RULES OF PROF'L CONDUCT R. 8.4 cmt. 2 (2002) (emphasis added)):

> "Many kinds of illegal conduct reflect adversely on fitness to practice law.... Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics *relevant to law practice*. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category."

As noted in the majority opinion, the hearing judge's conclusions on this point were based on his assessment that respondent's conduct was criminal in nature, fitting within the first prong of cases mentioned above. In finding a violation of Rule 8.4(d), the hearing judge determined that "[t]he Respondent indisputably hindered the administration of justice by providing a means for his son to flee the country." Findings of Fact and Conclusions of Law at 14. Thus, his conclusion as to Rule 8.4(d) relied on his earlier pronouncements that all the elements of the offense of hindering a police officer were present in this case.

In addition, Bar Counsel's Petition for Disciplinary Action bases both of the misconduct charges on the allegation that respondent's "actions in assisting his son to leave the State of Maryland, and subsequently the country, was in direct impedance and obstruction of the investigation of the murder of Alfred Enrique Tello, Jr. in violation of Maryland law and the Rules of Professional Conduct governing the actions of attor-

---

actions); *Attorney Grievance Comm'n v. McCoy,* 349 Md. 420, 708 A.2d 681 (1998) (inadequate representation of client); *Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 704 A.2d 1225 (1998) (gross neglect of client cases, commingling of funds); *Attorney Grievance Comm'n v. Hollis,* 347 Md. 547, 702 A.2d 223 (1997) (misappropriation of client funds); *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 653 A.2d 909 (1995) (simultaneous representation of two co-defendants); *Attorney Grievance Comm'n v. Eisenstein,* 333 Md. 464, 635 A.2d 1327 (1994) (attorney's handling of his claimant's money involved dishonesty); *Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 624 A.2d 503 (1993) (nonconsensual kissing and spanking of clients and employees).

neys." Petition for Disciplinary Action at 11. Thus, the 8.4(d) charge in the Petition was dependent upon a finding that the conduct being alleged was criminal. No language appears in the Petition alleging that the respondent's conduct was prejudicial to the administration of justice for any reason other than its alleged criminal nature. Consequently, in the instant case, as in the vast majority of 8.4(d) cases, the 8.4(d) charge is dependent upon the presence of another form of misconduct, rather than having an independent basis.

The majority, however, claims that the respondent's acts violate Rule 8.4(d) on two separate grounds: first, under the theory that his acts were criminal and, second, under an alternative theory that his acts were "directly harmful to the legal profession." I disagree. I doubt, under *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), that it is proper for the majority to conjure up, *sua sponte,* alternative grounds to support a violation of Rule 8.4(d). Furthermore, as mentioned earlier, I do not believe the respondent's actions constituted the offense of obstruction or hindering. Finally, because the actions taken by the respondent did not impact on his clients or on his law practice, I do not believe that his conduct was prejudicial to the administration of justice.

## A.

At the threshold, the majority's opinion as to the 8.4(d) charge is questionable under *In re Ruffalo, supra.* In *Ruffalo,* the petitioner was a trial lawyer who was charged with twelve counts of misconduct. As a result of incriminating testimonial evidence adduced during his hearing before a hearing board, the state's grievance commission added a thirteenth charge against the petitioner. The hearing board found the petitioner guilty of seven charges, including the appended thirteenth charge. On review, the Ohio Supreme Court held that the evidence was sufficient to sustain only two charges, including the thirteenth charge, and ultimately concluded that disbarment was required. Proceedings thereafter ensued to disbar petitioner in the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit, relying

solely on the record and findings of the Ohio courts, held that the thirteenth charge *alone* justified disbarment in its court. The United States Supreme Court, concluding that the petitioner was deprived of procedural due process, reversed, stating: "Disbarment . . . is a punishment or penalty imposed on the lawyer. * * * He is accordingly entitled to procedural due process, which includes fair notice of the charge." *Ruffalo*, 390 U.S. at 550, 88 S.Ct. at 1226, 20 L.Ed.2d at 122.

As *Ruffalo* holds, principles of due process require that fair notice of the charges be given to a defendant at the outset of disciplinary proceedings. Here, the majority states that, even if the conduct in question is not criminal, it is still prejudicial to the administration of justice in violation of Rule 8.4(d). According to the majority, "respondent's actions are so appalling that either shoe will fit; respondent's acts are both criminal in nature and directly harmful to the legal profession." To the extent that the majority opinion relies upon a basis for finding an 8.4(d) violation which was neither alleged in the Petition for Disciplinary Action nor relied upon by the hearing judge, it presents a procedural due process infirmity in contravention to the holding in *Ruffalo*. In this case, the respondent was never given notice of such a basis for the 8.4(d) charge nor an opportunity to defend against an 8.4(d) violation based on his acts being "directly harmful to the legal profession." As the Court in *Ruffalo* stated, disbarment proceedings are "adversary proceedings of a quasi-criminal nature. * * * The charge must be known before the proceedings commence." 390 U.S. at 551, 88 S.Ct. at 1226, 20 L.Ed.2d at 122. It seems clear that, when a court devises a new basis for a charge at the eleventh hour of a quasi-criminal proceeding, as the majority has done here, the respondent has been deprived of procedural due process.

As noted by the majority, the respondent has been charged in a Statement of Charges in *State of Maryland v. Sol Sheinbein*, District Court of Maryland, Montgomery County, Case No. 6D00071133, with the criminal offense of hindering a police officer. An arrest warrant on that charging document has been issued in that case for Sol Sheinbein, District Court

of Maryland, Warrant No. D98442735. Respondent, as a member of the Bar of this State, is an officer of this Court. It may be that the respondent's conduct, in failing to present himself for trial and perhaps willful avoidance of prosecution on this Maryland criminal charge, would constitute a violation of Rule 8.4(d) as conduct prejudicial to the administration of justice. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672 (Iowa 2001) (sanctioning an attorney as a member of the Iowa bar for willful avoidance of prosecution by failing to return to the United States to resolve charges alleged in a federal indictment). Because this theory was never alleged as a basis for the professional misconduct charge before this Court, due process, as held in *Ruffalo,* precludes this Court from considering it now.

## B.

In support for its argument that Rule 8.4(d) has been violated, the majority cites an Alaskan case in which an attorney was disbarred after having been convicted of certain criminal offenses. The majority then remarks that in our case, the respondent cannot be tried for obstruction or hindering because he remains in Israel. The majority's reliance on the Alaskan case assumes that the respondent would be convicted. Since the evidence was insufficient to find that the respondent committed the offense of obstruction or hindering by clear and convincing evidence, the case relied on by the majority furnishes no support for a finding of an 8.4(d) violation.

Next, the majority claims that it "has not always been the case" that conduct violating Rule 8.4(d) must relate to the lawyer's particular practice or clients, quoting the following statement in *Attorney Grievance Comm'n v. Richardson,* 350 Md. 354, 368, 712 A.2d 525, 532 (1998):

"The respondent argues that to be conduct that is prejudicial to the administration of justice, the act must be one that hinders or otherwise interferes with a judicial proceeding of which he is a party or represents a party. This Court

has never so narrowly defined Rule 8.4(d). We have instead recognized that conduct that impacts on the image or the perception of the courts or the legal profession, *see Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 536, 565 A.2d 660, 666 (1989) and that engenders disrespect for the courts and for the legal profession may be prejudicial to the administration of justice."

The majority capitalizes on this comment to broaden the scope of Rule 8.4(d) beyond any perceptible bounds.

In *Attorney Grievance Comm'n v. Alison,* 317 Md. 523, 565 A.2d 660 (1989), relied on in *Richardson* and by the majority here, we dealt with a lawyer who hurled epithets during judicial proceedings and whose "irrational dangerous conduct persisted over a period of two years." 317 Md. at 532, 565 A.2d at 664. There was no question that Mr. Alison's resistance to a court ordered search, foul language in court, and verbal abuse of court clerks, among other things, "impact[ed] on the image or perception of the courts or the legal profession." *Richardson, supra,* 350 Md. at 368, 712 A.2d at 532. Mr. Alison's conduct toward the court and court personnel obviously impacted on his legal practice and on his clients. Furthermore, it was oftentimes criminal.[13] Thus, this Court had no difficulty in holding that the conduct he publicly displayed bred disrespect for the courts and for the legal profession.

Here, in the majority's view, the respondent "usurped the role of twelve Maryland citizens" and supplanted it with his paternal instincts. Additionally, the majority claims that the respondent made it "impossible for the justice system to work," and "did everything in his power to ensure that his son circumvent that system." As a result, the majority concludes, "[i]t is difficult to see, as respondent suggests, how respondent's blatant interference with an ongoing police investigation

---

**13.** The conduct with which this Court was concerned with in *Alison* had its roots in marital discord. As a result of his conduct, Mr. Alison was convicted of driving while intoxicated, harassment, hindering a police officer, and misuse of subpoena.

'would not seriously impair public confidence in the entire legal profession' and not, as a result, impair public confidence in the integrity of the courts." The majority completely ignores the fact that, in September 1999, the Tel Aviv District Court convicted the respondent's son of murder. As stated earlier, under the Act of State Doctrine, this Court must respect this conviction and may not question its validity. Ultimately, we should acknowledge the fact that justice, under the applicable law, has been served in the underlying case against the respondent's son.

This case simply does not present facts, as the majority argues, "so appalling" as to constitute conduct prejudicial to the administration of justice in violation of MRPC 8.4(d). In the interest of giving members of the legal profession notice of what behavior in their personal lives will subject them to disciplinary action, I am unwilling to expand Rule 8.4(d) to include conduct as ambiguous as the respondent's in this case. Therefore, Bar Counsel has not presented facts, by clear and convincing evidence, demonstrating a violation of MRPC 8.4(d).

In conclusion, I believe that Bar Counsel's evidence was insufficient to support a finding of misconduct under either MRPC 8.4(b) or (d).

Judge RAKER agrees with the views expressed herein and joins this dissenting opinion.